# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Brock Fredin,

      Plaintiff,

      v.

Jamie Kreil,

      Defendant.

Case No. 0:20-cv-01929-SRN-HB

**Reply in Support of Jamie Kreil's Emergency Motion for Terminating Sanctions, a Temporary Restraining Order, and Attorneys' Fees, and Opposition to Fredin's Motion for Sua Sponte Cross Sanctions**

## Introduction

Fredin has only escalated his avowed "vigilante" tactics since Kreil filed her Motion for Sanctions. He created several new obscene and harassing videos concerning Kreil's counsel (and others) that are, if anything, *worse* than what prompted Kreil's Motion. *See* Third Lockner Decl. ¶¶ 3, 8, 13, 16, 19. He further began paying YouTube to promote his videos concerning Kreil's counsel, causing them to rack up *thousands* of views in just a few weeks. *Id.* ¶ 27. With his Opposition, Fredin declares that he will not recognize the Court's authority if it rules against him, and that "[u]nder no conditions will any of these websites or videos ever be taken down." Opp. at 4. Fredin has now dispelled any doubt that his campaign of extrajudicial harassment will continue unabated, or (more likely) spiral further out of control, unless the Court sends a strong message.

Fredin makes no effort to deny or justify his actions in his Opposition. He does not contest that he resorted to "vigilante" tactics because the Court did not punish his perceived enemies to his satisfaction. *See* Opp. to MSJ at 6, *Fredin v. Middlecamp*, 0:17-cv-03058 (Aug. 21, 2020). Nor does Fredin dispute that he made the websites and videos intending to harass and intimidate both Kreil's counsel and the Court. And Fredin makes no real attempt to explain the emails filed in a parallel case that show he tried to use his harassing websites and videos to extort favorable settlement terms from opposing counsel. *See* Breyer Decl. Ex. 17, *Fredin*

*v. Middlecamp*, Case No. 0:17-cv-03058-SRN-HB (D. Minn. Oct. 12, 2020). He does not dispute the foregoing because he *cannot* dispute it.

Fredin instead dedicates his Opposition to *ad hominem* attacks, baseless conspiracy theories, and meritless requests that Kreil's counsel be "*sua sponte* sanctioned." To the extent Fredin offers discernable arguments, they all boil down to this: despite Fredin's admitted and egregious misconduct, the Court is powerless to stop him. But Fredin is wrong—the Court "[is] entitled to send a message, loud and clear." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1122 (1st Cir. 1989). Kreil respectfully submits that the Court should do so.

## Argument

### I. The Court can and should sanction Fredin under its inherent authority.

Fredin offers a laundry list of reasons why he believes the Court cannot sanction him, despite his open efforts to harass and intimidate counsel and the Court. None of his arguments withstands scrutiny.

Fredin first contends that Kreil's counsel lack "standing" to file a motion for sanctions on their own behalf because they are not parties to this lawsuit. *See* Opp. at 6, 8-9. But Kreil's counsel did not file any such motion. Rather, *Kreil* filed a Motion for Sanctions based on Fredin's attempts to interfere with this litigation through extrajudicial means. *See* Mem. in Supp. at 4-8, 10-12. As explained in Kreil's opening brief, Fredin has attempted to exert improper pressure on

counsel and the Court, exemplified by his recent use of similar harassing and defamatory web publications to extort favorable settlement terms in a parallel case. *See* Mem. in Supp. at 3-8. This egregious misconduct entitles Kreil to relief under the Court's inherent authority. *See, e.g., Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, No. 00 C 5658, 2002 WL 1433717, at *11, *38 (N.D. Ill. July 2, 2002) (imposing sanctions where a party attempted to "to sabotage the litigation" through "intimidat[ion]" of counsel); *Bellet v. City of Buffalo*, No. 03-CV-00027, 2011 U.S. Dist. LEXIS 149724, at *7 (W.D.N.Y. Dec. 30, 2011) (imposing sanctions where a "plaintiff repeatedly made baseless accusations against the court" in an effort to harass and intimidate the court).

Fredin next contends that Kreil "do[es] not identify any actual statements (in or out of court) that [she] allege[s] is 'intimidation' or an 'insult.'" Opp. at 10. That is plainly not true. Kreil identifies more than a dozen false, defamatory, and harassing statements from Fredin's web publications concerning Kreil's counsel, the Court, or both. *See* Mem. in Supp. at 6-7, 11; Lockner Decl. ¶¶ 9-26, 31; *see also* Third Lockner Decl. ¶¶ 6, 11, 18. Fredin plainly meant the statements at issue—which include false accusations of racism, criminal activity, and unethical professional conduct, as well as graphic sexual content—to harm the professional reputations of Kreil's counsel, undermine the public's trust in the Court, and intimidate counsel and the Court. Mem. in Supp. at 7-8. And Fredin has been

criminally convicted of jeopardized the "'safety, security, or privacy of another,'" Minn. Stat. § 609.748, subd. 5(b), through similar web publications. *See State v. Fredin*, No. A19-0085, 2020 WL 1983050, at *1 (Minn. Ct. App. Apr. 27, 2020), *review denied* (July 23, 2020). He cannot feign innocence about the expected and intended impact of this behavior on his targets.

Fredin argues further that the Court "does not have the inherent authority to impose [Kreil's] requested relief" because it can only sanction misconduct that "took place within an[ ] actual court proceeding." Opp. at 10-11. But it is black-letter law that the Court's inherent authority "reaches both conduct before the court and that beyond the court's confines." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Courts routinely impose sanctions under their inherent authority based on harassing extrajudicial communications. *See, e.g., Blum v. Schlegel*, 91-CV-633S, 1996 U.S. Dist. LEXIS 21598, at *9 (W.D.N.Y. May 9, 1996) (imposing sanctions based in part on letters to the court, opposing counsel, and third parties); *Fid. Nat. Title Ins. Co. of New York*, 2002 WL 1433717, at *11, *38 (imposing sanctions based on a letter to opposing counsel); *Colida v. Panasonic Corp. of N. Am.*, No. 09 C 1786, 2011 U.S. Dist. LEXIS 49055, at *11 (N.D. Ill. May 3, 2011) (imposing sanctions based in part on emails to opposing counsel). And even were that not the case, Fredin uses his Opposition to repeat many of the same falsehoods from his web publications. *See, e.g.*, Opp. at 3-4, 6, 10.

4

The closest Fredin comes to an attempt to justify his conduct is his assertion that he "act[ed] in good faith" in the settlement negotiations discussed in Kreil's opening brief. Opp. at 10-11. But Fredin does not dispute that he agreed to take down his defamatory and harassing publications about opposing counsel on the condition he receive "<u>reasonable</u> terms by the end of the working day," and when the settlement terms offered were not to his satisfaction, Fredin re-posted the same publications and created several more. *See* Breyer Decl. Ex. 17, *Fredin v. Middlecamp*, Case No. 0:17-cv-03058-SRN-HB (D. Minn. Oct. 12, 2020); Mot. for TRO at 4, *Fredin v. Middlecamp*, Case No. 0:17-cv- 03058-SRN-HB (D. Minn. Oct. 12, 2020); Lockner Decl. ¶ 30.[1] Fredin fails to substantiate his bald claim in his brief to have operated in "good faith" with testimony or any other competent evidence.

In sum, Fredin fails to raise any argument that precludes the imposition of sanctions under the Court's inherent authority. If anything, Fredin's Opposition *underscores* the propriety of sanctions for the reasons discussed below.

---

[1] Fredin accuses Kreil's counsel of obtaining "privately discussed settlement discussions" through "bad faith efforts and backchannel communication." Opp. at 10. It is unclear why. As noted in Kreil's opening brief and above, the events at issue are detailed in public filings in the *Middlecamp* litigation. *See* Breyer Decl. Ex. 17, *Fredin v. Middlecamp*, Case No. 0:17-cv-03058-SRN-HB (D. Minn. Oct. 12, 2020); Mot. for TRO at 4, *Fredin v. Middlecamp*, Case No. 0:17-cv- 03058-SRN-HB (D. Minn. Oct. 12, 2020).

**II.    Fredin's conduct since the filing of Kreil's Motion confirms the necessity of sanctions.**

Fredin's "vigilante" tactics, *see* Opp. to MSJ at 6, *Fredin v. Middlecamp*, 0:17-cv-03058 (Aug. 21, 2020), have only intensified since Kreil filed her Motion, with new harassing videos that are, if anything, *worse* than what originally prompted Kreil's Motion. Fredin has further declared that he will not recognize the Court's authority should it rule against him, and that "[u]nder no conditions will any of [his] websites or videos ever be taken down," Opp. at 4. If sanctions were merely appropriate before, they are necessary now.

After the filing of Kreil's Motion, Fredin doubled down on his campaign of harassment and intimidation with new videos concerning Kreil's counsel and others. Third Lockner Dec. ¶ 3. These new videos feature images of Kreil's counsel set to obscene narrations of gay sex, *id.* ¶ 15, a false commercial that claims the undersigned participated in "wet t-shirt contests" set to vulgar images and music, *id.* ¶ 18, the Robins Kaplan logo superimposed on a confederate flag, *id.* ¶ 11, and allegations of criminal and unethical conduct against another Robins Kaplan associate. *Id.* ¶ 6. Fredin has also begun paying YouTube to promote his videos concerning Kreil's counsel, resulting in those videos accumulating *thousands* of views over the past few weeks. *Id.* ¶ 27. As a result, Kreil's counsel have begun to receive concerned inquiries by phone and via the firm's web contact form concerning "absolutely disgusting" videos about their firm. *Id.*

6

¶¶ 22-24, Exs. E, F. Kreil respectfully requests that the Court account for these new harassing videos (as well as any similar web publications Fredin creates after the filing of this Reply) in any relief it grants on Kreil's Motion.

Notably, Fredin prioritized creating new harassing web content over this litigation. He continued posting new videos up until shortly before the deadline to oppose Kreil's Motion for Sanctions. *Id.* ¶ 28. Then, having dedicated the time the Court allotted for his Opposition to this additional misconduct, Fredin ran to the Court just minutes before the deadline for an extension. *See* Nov. 2, 2020 Letter to District Judge.

When Fredin finally filed his Opposition, he used it as a platform for further attacks on Kreil's counsel and the Court. Among other things, Fredin falsely claims:

- Kreil's counsel "could care less about [sic]" their client, and are "using this litigation to harass [Fredin] on behalf of Special Assistant United States Attorney Lindsey Middlecamp and to curry favor with the United States Attorney's Office," Opp. at 2, 6;

- Kreil's counsel are engaged in a "racketeering scheme" with counsel for the defendants in Fredin's other lawsuits, *id.* at 3-4;

- Kreil's counsel are "financing fabricated allegations" against Fredin for their own personal gain, *id*. at 16; and

- the Court has jeopardized "[t]he integrity of the judicial system" by "allow[ing] an Assistant United States Attorney . . . to fabricat[e] evidence in matters before this Court." *Id.* at 11.

Fredin also filed his own "cross motion" for sanctions, discussed further in Section IV. The legal and factual grounds for the "cross motion" are unclear, but it appears to concern an imagined conspiracy among Kreil, her counsel, the defendants in other of Fredin's serial lawsuits, and their counsel. *See id.* at 6-8. The "cross motion" rests on patently false assertions of fact—for example, that "Kreil and her surrogates have filed . . . 15 cases" against Fredin, *id.* at 7, when Kreil has never filed a single lawsuit against him.

Given Fredin's actions, it is hard to see how this case can continue. Fredin has made it clear that he plans not only to continue, but to *escalate* his campaign of harassment and intimidation against counsel and the Court. Fredin further uses his Opposition to unequivocally declare that, whatever the Court rules, "[u]nder no conditions will any of [his] websites or videos ever be taken down." *Id.* at 4. Fredin's inequitable conduct here has not only prejudiced Kreil, but "exhibit[ed] such flagrant contempt for the court and its processes that to allow [Fredin] to continue to invoke the judicial mechanism for [his] own benefit would raise concerns about the integrity and credibility of the civil justice system." *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993).

8

### III.    Each specific sanction requested in Kreil's Motion is warranted under the circumstances.

Fredin does not specifically address Kreil's requests for terminating sanctions and attorneys' fees under the Court's inherent authority. Both are appropriate—indeed, necessary—to redress Fredin's sustained misconduct for the reasons set forth in Kreil's opening brief, *see* Mem. in Supp. at 9-15, 20-21, and in light of Fredin's recent, additional misconduct. *See supra* pp. 6-9.

Fredin instead dedicates much of his Opposition to arguing against Kreil's requested injunctive relief—primarily on First Amendment grounds.[2] But the authorities Fredin cites in his brief are inapposite here. The "speech of those participating before the courts c[an] be limited" in ways that might not be permissible in other contexts. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1072 (1991) (emphasis omitted). Indeed, "[i]n the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 n.21 (1981). As

---

[2] Fredin argues at length that Kreil and her counsel are "public officials." Opp. at 13-14. He contends this is so because (1) Kreil is employed as a professor at the University of Minnesota; (2) Kreil's counsel "is likely receiving funds from various organizations both individually and in concert with other law firms to fund the legal expense for . . . Kreil," and (3) one of Kreil's counsel previously clerked on the Minnesota Court of Appeals. *Id*. at 13-14. It is not clear how any of those things would render Kreil or her counsel "public officials," or why Fredin believes Kreil's counsel is receiving public funding in connection with this case (they are not). Fredin does not explain. Nor does Fredin explain what impact he believes this to have on the First Amendment analysis.

Justice Holmes cogently observed, "the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." *Patterson v. Colorado ex rel. Attorney General of Colorado*, 205 U.S. 454, 463 (1907).

The Supreme Court has affirmed restrictions on attorney speech outside of the courtroom that poses a "'substantial likelihood of material prejudice'" to pending litigation, finding that this strikes a "permissible balance" between the First Amendment and the courts' interest in the orderly administration of justice. *Gentile*, 501 U.S. at 1075. Fredin acts as an attorney here, and his websites and videos—through which he has attempted to improperly influence this litigation through harassment and intimidation—more than meet the "'substantial likelihood of material prejudice'" standard. In sum, Fredin invoked the Court's power by filing suit, and thus subjected himself to its inherent authority "'to impose silence, respect, and decorum," and to preserve the integrity of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)).

Moreover, even if Fredin's websites and videos arose in a different context, the First Amendment still would not shield them from injunctive relief. Courts "have the power to enjoin harassing communication." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005); *see also United Artists Corp. v. United*

10

*Artist Studios LLC*, Case No. 19-828-MWF, 2019 WL 6917918, at *10-12 (C.D. Cal. Oct. 17, 2019) (finding "[c]onduct that might not be harassing under other circumstances becomes so . . . because it is obvious that the [defendant] is improperly trying to intimidate anyone who dares oppose him" and granting a TRO and preliminary injunction prohibiting continued harassment by the defendant); *Myart v. Taylor*, No. SA: 5:16-CV-736-DAE, 2016 WL 5376227, at *4-5 (W.D. Tex. Sept. 26, 2016) (enjoining a party from further "harassment in connection with th[e] suit" through extrajudicial communications); *Teledyne Technologies, Inc. v. Shekar*, No. 15-cv-1392, 2015 WL 5438648, at *2-3 (N.D. Ill. June 17, 2015) (entering protective order enjoining defendant from: "(1) threatening opposing counsel, court staff, or witnesses . . . (2) otherwise engaging in threatening, intimidating, or abusive communications with such individuals"); *Kee v. R-G Crown Bank*, 656 F. Supp. 2d 1348, 1353-54 (D. Utah 2009) (enjoining plaintiff from further "harassing and abusive contacts, including repeated phone calls and abusive writings.").

Fredin's websites and videos here meet the definition of "harassment," as they are calibrated to "cause[ ] substantial emotional distress to" their targets "and serve[ ] no legitimate purpose." Harassment, Black's Law Dictionary (11th ed. 2019); *see also* Wis. Stat. section 813.125(1) (defining "harassment" subject to injunction in relevant part as "[e]ngaging in a course of conduct or repeatedly

committing acts which harass or intimidate another person and which serve no

legitimate purpose"). These repeated web publications feature false and

inflammatory accusations, disturbing imagery, and vulgar sexual content that

(particularly given the subject matter of this case) have put Kreil's counsel in

reasonable fear of their and their families' safety and privacy. *See* Lockner Decl.

¶¶ 9-29; Third Lockner Decl. ¶¶ 6, 11, 15, 18. Fredin does not dispute that fact, or

that he intended that effect. Nor could he credibly do so, as courts have

repeatedly found his similar web publications to constitute harassment properly

subject to injunctive relief.[3] And Fredin's web publications serve no legitimate

purpose—indeed, Fredin does not deny that they are meant to serve the patently

*illegitimate* purpose of harassing and intimidating counsel and the Court.

Finally, Fredin fails to address Kreil's requested alternative relief—a

monetary penalty that applies so long as Fredin maintains his harassing web

publications. *See* Mem. in Supp. at 19-20. Fredin's authorities do not apply to this

---

[3] *See, e.g.*, *Miller v. Fredin*, No. A18-1154, 2019 WL 3293766, at *2 (Minn. Ct. App. July 22, 2019), *review denied* (Oct. 15, 2019) (affirming the district court's finding that Fredin had violated a harassment restraining order "by creating and placing content about [his victim] on the internet"); *State v. Fredin*, No. A19-0085, 2020 WL 1983050, at *1 (Minn. Ct. App. Apr. 27, 2020), *review denied* (July 23, 2020) (affirming Fredin's conviction for violating a restraining order related to Fredin's harassing web posts concerning another of his victims); *Schaefer v. Fredin*, No. A19-0657, 2020 WL 1921101, at *2 (Minn. Ct. App. Apr. 20, 2020), *review denied* (July 23, 2020) (affirming the district court's finding that Fredin violated a restraining order "by creating posts on specific websites" concerning another of his victims).

alternative in light of the "distinction . . . between prior restraints" (such as injunctions) "and subsequent punishments" (like monetary penalties). *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993) "Although 'it is presumptively unlawful to bar speech before it occurs, First Amendment law fully accepts the ability to penalize speech that occurred in the past, after it has been challenged and the speaker has had the opportunity for appellate review.'" *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1145 n.5 (D. Minn. 2017) (quoting *Nat'l Fed'n of Blind v. FTC*, 303 F. Supp. 2d 707, 723 (D. Md. 2004)).

Fredin goes on to argue that Kreil cannot meet the other factors Courts typically consider in awarding injunctive relief. But Courts have held "the traditional standards for injunctive relief, *i.e.* irreparable injury and inadequate remedy at law, do not apply to the issuance of an injunction against a vexatious litigant" under the Court's inherent authority. *In re Martin-Trigona*, 737 F.2d 1254, 1262 (2d Cir. 1984). "Where the jurisdiction of the federal courts is in need of protection, [the Court] need not await the arrival of a litigant able to show a private entitlement to relief." *Id.* Fredin has engaged in vexatious and harassing "vigilante" tactics, Opp. to MSJ at 6, *Fredin v. Middlecamp*, 0:17-cv-03058 (Aug. 21, 2020), meant to undermine these and other proceedings. The Court may enjoin this inequitable conduct whether or not Kreil herself can meet every factor for injunctive relief that courts evaluate in other contexts.

13

Regardless, Kreil meets the other factors. As to the second (irreparable harm), Fredin argues "Kreil will not suffer irreparable harm because she is not the subject" of Fredin's websites and videos. Opp. at 15. But as explained in Kreil's opening brief, Kreil is harmed by Fredin's attempt to distort these proceedings and to deter her *pro bono* counsel from representing her through extrajudicial harassment. *See* Mem. in Supp. 10-11, 18. Fredin effectively admits this aim, characterizing counsel's representation of Kreil as a "corrupt *pro bono* scheme" that he intends to "expos[e]." Opp. at 6. Kreil has a right to defend herself, through her counsel of choice, free from improper interference with her counsel. *See, e.g.*, *Guajardo-Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010). Fredin is irreparably harming that interest by damaging the professional reputations of Kreil's counsel and putting them in reasonable fear of their safety and privacy in retaliation for their representation of Kreil. *See* Lockner Decl. ¶¶ 28-29. And as discussed above, Fredin has done everything in his power to exacerbate that injury since the filing of Kreil's Motion for Sanctions.

With respect to the third injunctive relief factor, Fredin baldly asserts that the balance of harms tips in his favor because injunctive relief would abridge his First Amendment rights. *See* Opp. at 15-16. But that is not so for all of the reasons discussed above. *See supra* pp. 9-14. As explained above, the harm at issue is not

14

simply harm to Kreil's counsel and Kreil herself, but harm to "the integrity and credibility of the civil justice system." *Barnhill*, 11 F.3d at 1368.

Finally, Fredin argues that the public interest disfavors the issuance of an injunction because the public has a right to know that "Robins Kaplan is financing fabricated allegations to curry favor with the United States Attorneys' Office." Opp. at 16. But as explained in the Declaration of Anne Lockner, *see* Lockner Decl. ¶¶ 9-26, this allegation is patently false. Fredin offers no evidence in rebuttal, nor could he. The public interest does not favor further spreading this falsehood that Fredin does not even try to substantiate. And Fredin fails to explain how the balance of his harassing web publications serve the public interest—for example, his false assertions that Kreil's counsel are racist, his charges of a conspiracy between Kreil's counsel and the Court, and his obscene narrations of gay sex set to images of an associate at Robins Kaplan. *See* Lockner Decl. ¶¶ 9-26; Third Lockner Decl. ¶¶ 6, 11, 15, 18. It is clear that the only interest Fredin intends to serve with his harassing web publications is his own.

In any event, the public interest *demands* injunctive relief. Fredin has taken it upon himself to use "vigilante" tactics, Opp. to MSJ at 6, *Fredin v. Middlecamp*, 0:17-cv-03058 (Aug. 21, 2020), to stomp out what he calls the "corrupt *pro bono* scheme" that has narrowly prevented him from crushing his victims under the weight of legal fees. Opp. at 6. The availability of *pro bono* representation for the

15

victims of serial litigation serves the public interest. Permitting the publications at issue to remain online, and thus to continue to cause damage unless counsel incurs the expense and burden of filing a new lawsuit, can only encourage Fredin and other unscrupulous litigants to employ similar tactics in the future. This conduct poses a threat to the integrity of the court system itself.

## IV.   The Court should deny Fredin's improper and baseless request that Kreil's counsel be "*sua sponte* sanctioned."

Fredin filed a "Motion for Sua Sponte Cross Sanctions" in retaliation for Kreil's Motion for sanctions. The Motion has no clear legal basis and rests on false factual allegations. Among other things, it (1) fails to specify the legal grounds for sanctions (*i.e.*, Rule 11 or the Court's inherent authority); (2) fails to specify what relief Fredin seeks, (3) falsely claims that Kreil and her counsel have engaged in abusive lawsuits and motions directed at Fredin outside of this case; and (4) falsely accuses Kreil's counsel (and every other lawyer Fredin has encountered during his legal misadventures) of participating in a coordinated "harassment scheme" against Fredin. *See* Opp. at 4, 6-8. Fredin supplies neither legal analysis nor evidentiary support for his conspiratorial accusations. The Motion is frivolous and should be denied.

Indeed, Fredin's recent conduct—both his campaign of harassment and his "Motion for Sua Sponte Cross Sanctions"— only confirms that he can and should be designated a vexatious litigant. In particular, he has "caused needless expense

16

to other parties [and] has posed an unnecessary burden on the courts" through both. *Westley v. Bryant*, No. 14-CV-5002, 2015 WL 2242161, at *10 (D. Minn. May 12, 2015).

## Conclusion

The misconduct at issue in Kreil's Motion is sufficient in and of itself to warrant the most severe sanctions available under the Court's inherent authority. But it does not stand alone. Rather, it is part of an escalating pattern of abuse and disrespect of the judicial process over the course of three years of serial litigation. *See, e.g.*, Mem. in Supp. of Mot. to Dismiss (Dkt. 12) at 24-27. The Court has given Fredin every opportunity to litigate any claims he may have in good faith. It is clear that this point that Fredin will not do so—indeed, he has now told the Court as much on several occasions. *See, e.g.*, Opp. at 4 (stating that Fredin will not abide by any order the Court may enter requiring him to take down his harassing web publications), Letter, *Fredin v. Middlecamp*, Case No. 0:17-cv-03058 (D. Minn. June 29, 2020) (stating that Fredin would take actions to "protest" the Court because it had "tainted its judicial record forever); Opp. to MSJ at 4, 6, *Fredin v. Middlecamp*, 0:17-cv-03058 (Aug. 21, 2020) (stating that the Court had "attack[ed]" Fredin and that Fredin has reached the "vigilante stage"). It is time for the Court to take him at his word. The Court should intercede, before his campaign of harassment spirals further out of control.

17

DATED:  November 12, 2020          **ROBINS KAPLAN LLP**

By:___/s/ *Anne M. Lockner*_____
Anne M. Lockner (0295516)
J. Haynes Hansen (Bar No. 0399102)
Ena M. Kovacevic (Bar No. 0400149)
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
alockner@robinskaplan.com
ekovacevic@robinskaplan.com
hhansen@robinskaplan.com

*Counsel for Defendant Jamie Kreil*